**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| MONEY CENTER OF AMERICA, INC., | : | Case No. 14-10603(CSS) |
| et al., | : | Jointly Administered |
| Debtors. | : | |
| _____ | : | |
| CASINO CARIBBEAN, LLC, MACAU | : | |
| CASINO, LLC, MACAU | : | |
| SOUTHCENTER, LLC, and Yakima | : | |
| CARDROOM, LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | Adv. Proc. Case No.: 14-50437 (CSS) |
| | : | |
| MONEY CENTERS OF AMERICA, INC.: | | |
| CHECK HOLDINGS, LLC, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |
| MICHAEL ST. PATRICK BAXTER, | : | |
| Solely in his capacity as Chapter 11 | : | |
| Trustee of Money Centers of America, | : | |
| Inc., et al. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Proc. Case No.: 16-50410 (CSS) |
| | : | |
| THUNDERBIRD ENTERTAINMENT | : | |
| CENTER, INC., a wholly owned entity | : | |
| Of the sovereign Absentee Shawnee | : | |
| Tribe of Oklahoma, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**OPINION[1]**

_____

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12…" Fed. R. Bankr. P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

**ASHBY & GEDDES, P.A.**
Ricardo Palacio
Benjamin W. Keenan
500 Delaware Avenue
Wilmington, DE  19899
     -and-
Daniel E. Gomez
CONNER & WINTERS, LLP
4000 One Williams Center
Tulsa, OK  74172-0148
Counsel for the Quapaw Casino
Authority of the Quapaw Tribe of Oklahoma

**COLE SCHOTZ P.C.**
Norman L. Pernick
Patrick J. Reilly
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
     -and-
**ASK LLP**
Edward E. Neiger
Brigette G. McGrath
151 West 46th  Street, 4th Floor
New York, NY 10035
     -and-
Joseph L. Steinfeld
2600 Eagan Woods Drive
Suite 400
St. Paul, MN  55121
     -and-
COVINGTON & BURLING LLP
Benjamin J. Razi
Dennis B. Auerbach
1201 Pennsylvania Avenue, N.W.
Washington, DC  20004-2401
     -and-
Dianne Coffino
620 Eighth Avenue
New York, NY  10018
Co-Counsel for the Chapter 11 Trustee

**LAW OFFICE OF SUSAN E. KAUFMAN, LLC**
Susan E. Kaufman
929 North Market Street
Suite 460
Wilmington, DE  19801
     -and-
Kirk Cullimore, Jr.
Law Offices of Kirk A Cullimore, LLC
644 E. Union Square
Sandy, Utah 84070
Counsel for the Defendant
Thunderbird Entertainment Center, Inc.

Dated: February 28, 2017

Sontchi, J. _Clifford S. Sontchi_

## INTRODUCTION

Before the Court are two motions to dismiss preferential actions brought by the Chapter 11 Trustee of the above-captioned estates.  The two movants are casinos that were formerly in a contractual relationship with the Debtors.[2]  The two moving casinos are both associated with and are run by their respective Indian tribes.  The motions are based the tribes' sovereign immunity from lawsuits.  Therein, the Court is asked whether the casinos have a sufficient relationship with their respective Indian tribes to enjoy the tribes' sovereign immunity, whether Section 106(a) of the Bankruptcy Code abrogates their sovereign immunity, if any, and whether one of the casinos waived its sovereign immunity, if any, by filings a complaint and/or proof of claim against one of the Debtors' estates.

As set forth *infra*, the Court finds that (i) this is a facial attack on the Court's subject matter jurisdiction allowing the Court to review various documents attached to the pleadings; (ii) both QCA and Thunderbird are sufficiently related to their respective Indian tribes to enjoy the tribes' sovereign immunity; and (iii) neither Section 106(a) nor Section 101(27) abrogates QCA's and Thunderbird's sovereign immunity.

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them *infra*.

Thus, the Court lacks subject matter jurisdiction over the claims against QCA and Thunderbird, provided, however, the Court further finds that QCA *may* have waived its sovereign immunity *solely* to the extent of recoupment, but *only* to the extent of QCA's claims against the estates (i.e. the Trustee will not be able to recover any amounts in excess of QCA's claims from QCA).

## JURISDICTION

The matter before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E) and (F), and the Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a).

A bankruptcy court has jurisdiction to determine whether it has subject matter jurisdiction over an adversary proceeding filed in a case before the court.[3] The motion to dismiss for lack of subject matter jurisdiction is filed under Federal Rule of Civil Procedure 12, which apples to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7012. Accordingly, this Court may determine whether to dismiss Trustee's claims for lack of subject-matter jurisdiction.

---

[3] *See The Fairchild Liquidating Trust v. State of New York (In re The Fairchild Corp.)*, 452 B.R. 525, 528 (Bankr.D.Del.2011) (citations omitted). *See also Chicot County Drainage Dist. v. Baxter State*, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940) (explaining a federal court has authority to determine whether it has jurisdiction over a dispute)).

# FACTUAL BACKGROUND

**A.     Background of the Debtors' Bankruptcy Cases**

On March 21, 2014, Money Centers of America, Inc. ("Money Centers") filed a voluntary petition with the United States Bankruptcy Court for the District of Delaware under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On May 23, 2014, Money Center's wholly owned subsidiary, Check Holdings, LLC ("Check Holdings," and collectively with Money Centers, the "Debtors"), filed its voluntary petition under the Bankruptcy Code.  Thereafter, the Court entered an order jointly administering the Debtors' cases.

On April 23, 2014, the Court ordered that the Office of the United States Trustee appoint a Chapter 11 trustee for Money Center's estate.  The Court further ordered that Money Center's interest as the sole member of Check Holdings, LLC, vests in the trustee and the trustee shall be in control of the membership interest and all powers thereto.[4] The Court later approved the appointment of Michael St. Patrick Baxter as chapter 11 trustee (the "Trustee") in the Debtors' cases.[5]

**B.     Parties in the Adversary Actions**

   ***i.     Casino Caribbean, LLC v. Money Centers of America, Inc.**, Adv. Pro. No. 14-50437*

The intervening plaintiff in Adversary Proceeding 14-50437 (the "QCA Adversary Action") is Quapaw Casino Authority ("QCA") an alleged governmental subdivision of

---

[4]  D.I. 85.

[5]  D.I. 89.

the Quapaw Tribe of Oklahoma, a federally recognized Indian tribe and sovereign nation, which owns and operates the Quapaw Casino in Miami, Oklahoma. QCA is listed on Check Holdings' bankruptcy schedules as a creditor.[6] In addition, QCA filed a proof of claim in these cases.[7]

The defendant in the QCA Adversary Action is Check Holdings.

ii. *Baxter v. Thunderbird Entertainment Center, Inc.*, **Adv. Pro. No. 16-50410**

The plaintiff in Adversary Proceeding 16-50410 is the Trustee on behalf of Debtors in an action to avoid preferential transfers against the defendant Thunderbird Entertainment Center, Inc., a wholly owned entity of the Absentee Shawnee Tribe of Oklahoma, a federal recognized Indian Tribe and sovereign nation (hereinafter, "Thunderbird," and Adversary Proceeding 16-50410, the "Thunderbird Adversary Action").

**C.    Procedural Background of Adversary Actions**

*i.    QCA Adversary Action*

On July 7, 2014, four gaming enterprises and creditors of Check Holdings brought the above-captioned QCA Adversary Action seeking to recover funds they are owed on the basis that such funds are not property of the Check Holdings' bankruptcy estate. Thereafter, on January 28, 2016, as it had substantially identical claims to that of the plaintiffs, QCA was granted leave to intervene as an additional adversary plaintiff in the QCA Adversary Action. Shortly thereafter, QCA filed its intervenor complaint (the

---

[6] D.I. 178, Schedule F.

[7] *See* Claims Register of MCA, Claim No. 23-1; Claims Register of Check Holdings, Claim No. 3-1.

"QCA Complaint").  On March 2, 2016, the Trustee filed its answer and counterclaims seeking to recover alleged transfers made to QCA, pursuant to Sections 547, 548, and 550 of the Bankruptcy Code (the "QCA Counterclaims").  QCA filed a motion to dismiss (the "QCA Motion to Dismiss") the QCA Counterclaims on the basis of tribal sovereign immunity.  The QCA Motion to Dismiss has been fully briefed and is the subject of this Opinion.

> ii.    *Thunderbird Adversary Action*

On March 21, 2016, the Trustee commenced the Thunderbird Adversary Action by filing a complaint against Thunderbird seeking recovery of transfers pursuant to sections 547, 548 and 550 of the Bankruptcy Code made in the 90-days prior to Money Center's petition date in an amount not less than $220,633.80, as well as claims disallowance pursuant to section 502 of the Bankruptcy Code.  In response, Thunderbird filed a motion to dismiss (the "Thunderbird Motion to Dismiss") the complaint on the basis of tribal sovereign immunity.  The Thunderbird Motion to Dismiss has been fully briefed and is also subject of this Opinion.

**D.    Factual Background Related to Adversary Actions**

Both QCA and Thunderbird entered into various "Financial Services Agreements" (each an "Agreement" and together the "Agreements") with Check Holdings.[8]  Through the Agreements, Check Holdings provided Automated Teller Machines ("ATM") and

---

[8]  The Thunderbird Adversary Action pleadings did not contain any factual detail; however, as this is the general basis of the Debtors' business prior to bankruptcy, it is set forth herein to show how the (alleged) transfers occurred between Money Centers and both QCA and Thunderbird.

other cash advance transaction services to QCA and Thunderbird, both operating casinos. Patrons of both casinos would use their credit or debit cards at ATMs located in the casinos or would present checks to the casinos' cash vaults and would receive cash. The casinos would advance the cash by stocking the ATMs from their vaults or by directly providing cash to patrons for check advances, and Check Holdings would process the transactions through the patrons' financial institution (which included its fee). Check Holdings incurred an independent liability to the casinos to reimburse the casinos for the amount paid to the patron.

### i.    Factual History Related to QCA

QCA alleges that beginning April 25, 2014, Check Holdings failed to reimburse funds that QCA had advanced through ATM stocks and direct advances to its patrons. Several days later, as alleged by QCA, QCA's management discovered that Money Centers had filed for bankruptcy several months earlier and that Money Centers and its owners had judgments taken against them by other tribal gaming enterprises.

QCA alleges that on May 14, 2014, QCA stopped allowing cash advances and on May 15, 2014, QCA notified Check Holdings and the Trustee that it was terminating the Agreement. As noted above, about a week after this (alleged) termination, Check Holdings filed for bankruptcy.

QCA alleges that QCA advanced $502,018.00 under the Agreement from April 16, 2014 to May 14, 2014, for which Check Holdings failed to reimburse QCA. In addition to filing its proofs of claim, QCA commenced the above-captioned adversary for declaratory

judgment seeking a declaration from the Court that the funds are not property of the Debtors' bankruptcy estates and that the automatic stay does not apply (or, in the alternative, for relief from the automatic stay).

In his answer and in addition to denying the claims set forth by QCA, the Trustee asserted the QCA Counterclaims to avoid and to recover preferential transfers made by Check Holdings to QCA in the 90 days preceding Check Holdings' bankruptcy. The Trustee asserts that Check Holdings made $1,114,020.76 in preferential transfers to QCA and seeks the return of those monies and disallowance of QCA's proof of claim.

QCA filed this motion to dismiss the QCA Counterclaims on the grounds that the claims are barred by tribal sovereign immunity. QCA further asserts that the QCA Counterclaims do not sound in recoupment and, therefore, do not fall within the exception to sovereign immunity for defenses and counterclaims for recoupment.

### ii.    Factual History Related to Thunderbird

The Trustee alleges that when a casino patron submitted their credit or debit cards to Thunderbird, Thunderbird would process those cards through equipment provided by Money Centers. If the transaction was approved by the patron's card issuer, Thunderbird would advance the cash to its patron. Thereafter, Money Centers would obtain an amount equal to the cash advance from the patron's card issuer. Upon receipt of the monies from the card issuers, Money Centers was required to forward the amount to Thunderbird, retaining its fee. The Trustee alleges that Money Centers remitted these amounts to Thunderbird and that in the 90-days prior to Money Center's bankruptcy,

Money Center transferred payments aggregating an amount not less than $220,633.80 to Thunderbird. The Trustee, on behalf of Money Centers' estate, seeks avoidance and recovery of these transfers.

Thunderbird filed a motion to dismiss the complaint on the grounds that the claim is barred by tribal sovereign immunity.

## STANDARD OF REVIEW

QCA and Thunderbird assert that their claims of sovereign immunity are a matter of subject matter jurisdiction and are properly challenged under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

The Trustee responds that a claim for sovereign immunity is an affirmative defense and not an issue of subject matter jurisdiction.  The Trustee asserts that the QCA's and Thunderbird's sovereign immunity defense is based on facts that are not alleged in the movants' pleadings and that the QAC and Thunderbird will need to prove these facts at trial.

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to bring a motion to dismiss for lack of subject matter jurisdiction.[9]  As a rule, the party invoking the federal court's jurisdiction bears the burden of establishing that the Court has the requisite jurisdiction.[10]  A motion to dismiss under Rule 12(b)(1) challenges the power of

---

[9] Fed. R. Civ. P. 12(b)(1).

[10] *See, e.g., Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009).

the federal court to hear a claim or case.[11]  "If a court lacks subject matter jurisdiction, it is generally barred from taking any action that goes to the merits of the case."[12]  A defendant may challenge the plaintiff's invocation of federal jurisdiction in one of two ways: (1) to challenge the sufficiency, but not the accuracy, of the facts alleged in the complaint; or (2) to challenge the accuracy of the complaint's factual allegations.[13]  As discussed above, there is a dispute between the parties whether QCA's and Thunderbird's claim for sovereign immunity should be reviewed as a subject matter jurisdiction challenge or whether it should be asserted by QCA and Thunderbird as an affirmative defense.

Sovereign immunity can be reviewed (i) on the basis of subject matter jurisdiction or (ii) as an affirmative defense.[14]  In *Christy v. Pennsylvania Turnpike Commission*, the Third Circuit held that sovereign immunity did not implicate subject matter jurisdiction.[15]  In citing *Christy*, the Delaware District Court explained:

> The Third Circuit has recognized that an assertion of Eleventh Amendment immunity does not implicate subject matter jurisdiction in the ordinary sense.  In that regard, Eleventh Amendment immunity is treated as an affirmative defense,

---

[11] *See, e.g.*, *Democracy Rising PA v. Celluci*, 603 F. Supp. 2d 780, 788 (M.D. Pa. 2009).

[12] *Shortt v. Richlands Mall Assocs., Inc.*, No. 90-2056, 1990 WL 207354, at *4 (4th Cir. Dec. 19, 1990).

[13] *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 290 (3d Cir. 2006); *Broadhollow Funding, LLC v. Bank of America, N.A. (In re Am. Home Mortg. Holdings, Inc.)*, 390 B.R. 120, 128 (D. Del. 2008).

[14] *Frederick L. v. Dep't of Pub. Welfare*, 157 F. Supp. 2d 509, 515 (E.D. Pa. 2001).

[15] *Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995) (*citing ITSI T.V. Prods., Inc. v. Agric. Associations*, 3 F.3d 1289, 1291 (9th Cir. 1993)) ("We agree with the Ninth Circuit that whatever its jurisdictional attributes, Eleventh Amendment immunity should be treated as an affirmative defense, and like any such defense, that which is promised by the Eleventh Amendment must be proved by the party that asserts it and would benefit from its acceptance. We also agree with the Ninth Circuit that considerations of fairness support this conclusion." (quotation marks and text modifications omitted)).

and the party asserting immunity must prove its existence. With respect to factual questions that arise in that analysis, the party asserting Eleventh Amendment immunity bears the burden of production and persuasion.[16]

However, one year later, in *Blanciak v. Allegheny Ludlum Corp.*, the Third Circuit held:

Although defendants brought their Eleventh Amendment objection by way of a motion for summary judgment under Fed.R.Civ.P. 56(b), the Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction. Accordingly, the motion may properly be considered a motion to dismiss the complaint for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1).[17]

---

[16] *Miller v. Delaware Tech. & Cmty. Coll.*, No. CIV.A. 12-216-SLR, 2013 WL 1832072, at *6 (D. Del. May 1, 2013), *report and recommendation adopted*, No. CV 12-216-SLR/CJB, 2013 WL 5314871 (D. Del. Sept. 16, 2013) (*citing Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d 1140, 1146 (3d Cir.1995) and *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 229 (3d Cir. 2006)). The Fourth Circuit noted:

Unlike subject-matter jurisdiction, which cannot be waived, a State can always waive its immunity and consent to be sued in federal court, *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), and a court need not raise the issue on its own initiative, *Wis. Dep't of Corr.*, 524 U.S. at 389, 118 S.Ct. 2047. Because a defendant otherwise protected by the Eleventh Amendment can waive its protection, it is, as a practical matter, structurally necessary to require the defendant to assert the immunity. We therefore conclude that sovereign immunity is akin to an affirmative defense, which the defendant bears the burden of demonstrating. In so concluding, we join every other court of appeals that has addressed the issue.

*Hutto v. S. Carolina Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014) (citations omitted).

[17] *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 694 n. 2 (3d Cir. 1996) (*citing Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98–100, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1984)). *See also Love v. New Jersey State Police*, No. CV141313FLWTJB, 2016 WL 3046257, at *6 (D.N.J. May 26, 2016) ("An assertion of Eleventh Amendment immunity is a challenge to a district court's subject matter jurisdiction."); *Zimmer v. New Jersey Div. of Child Prot. & Permanency*, No. CV152524FLWDEA, 2016 WL 234844, at *4 (D.N.J. Jan. 20, 2016) (same); *Orden v. Borough of Woodstown*, No. CV 13-5002 (JBS/AMD), 2015 WL 8513255, at *5 (D.N.J. Dec. 11, 2015) ("The plaintiff ordinarily has the burden of establishing jurisdiction. But because immunity under the Eleventh Amendment is treated as an affirmative defense, it does not implicate federal subject matter jurisdiction in the ordinary sense, and the party asserting Eleventh Amendment immunity (and standing to benefit from its acceptance) bears the burden of proving its applicability." (internal quotation marks and citations omitted)); *Rozzelle v. Univ. of N. Carolina at Charlotte*, No. 3:15-CV-00050-MOC, 2015 WL 6393004, at *4 (W.D.N.C. Oct. 2, 2015), *report and recommendation adopted*, No. 3:15-CV-00050-MOC, 2015 WL 6440839 (W.D.N.C. Oct. 21, 2015) ("It is appropriate to consider Defendants' claim of immunity as a challenge to the Court's subject matter jurisdiction."); *Aryafar v. S. Piedmont Cmty. Coll.*, No. 3:14-CV-702-RJC-DSC, 2015 WL 5737904, at *2 (W.D.N.C. Sept. 30, 2015) ("Ordinarily, a plaintiff bears the burden of proving subject matter jurisdiction when a Rule 12(b)(1) motion challenge is raised. However, a defendant bears the burden of

Thus, "[t]ypically, when jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff bears the burden of persuading the court that subject matter jurisdiction exists.  However, because . . . [sovereign] immunity can be expressly waived by a party, or forfeited through non-assertion, it does not implicate federal subject matter jurisdiction in the ordinary sense, and therefore, a party asserting . . . [sovereign] immunity bears the burden of providing its applicability.[18]

The District Court for the Eastern District of Pennsylvania in *Frederick L. v. Department of Public Welfare*, after reviewing both of the Third Circuit's holdings noted above,[19] discussed the two different varieties of Rule 12(b)(1) motions:

> With regard to the first type, a facial attack on the court's subject matter jurisdiction, the court is required to assume that plaintiff's allegations are true.  When confronted with the second type, a factual attack, the court is "free to weigh the

---

[18] demonstrating sovereign immunity under the Eleventh Amendment when seeking dismissal under Rule 12(b)(1)." (citations and footnote omitted)).

[18] *Love v. New Jersey State Police*, No. CV141313FLWTJB, 2016 WL 3046257, at *6 (D.N.J. May 26, 2016) (citations and internal quotation marks omitted).  *See also Zimmer v. New Jersey Div. of Child Prot. & Permanency*, No. CV152524FLWDEA, 2016 WL 234844, at *4 (D.N.J. Jan. 20, 2016).

[19] The *Frederick L.* Court stated:

> Defendants raise the issue of Eleventh Amendment immunity under Rule 12(b)(1) on subject matter jurisdiction grounds. In *Blanciak* . . ., the Third Circuit recognized that the Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction.  The Third Circuit went on to say that such a motion may be filed pursuant to Rule 12(b)(1). One year before, however, our court of appeals stated that Eleventh Amendment immunity does not implicate federal subject matter jurisdiction in the ordinary sense because it can be expressly waived by a party, or forfeited through non-assertion.  As such, the Third Circuit determined in *Christy* that Eleventh Amendment immunity should be analyzed as an affirmative defense to be established by the party raising it.  Where Eleventh Amendment immunity was asserted in a motion to dismiss for lack of subject matter jurisdiction, this Court has evaluated the motion under the standard provided for by Rule 12(b)(6).

*Frederick L.*, 157 F. Supp. 2d at 515 (citations and quotations marks omitted).

> evidence and satisfy itself as to the existence of its power to hear the case" because there is "no presumptive truthfulness attache[d] to plaintiff's allegations." Factual evaluations under Rule 12(b)(1) are appropriate at any stage in the proceedings after the filing of an answer. Here, no answer has been filed. Thus, regardless of whether I treat Defendants' assertion of the Eleventh Amendment bar as a motion under Rule 12(b)(1) or Rule 12(b)(6), I am required to take Plaintiffs' facts as true.[20]

Here, QCA and Thunderbird are making facial attacks on subject matter jurisdiction, as they have disputed the QCA Counterclaims and the Thunderbird Complaint based on the face of the allegations contained therein, rather than on any factual basis asserted by the Trustee.[21] Furthermore, it is QCA's and Thunderbird's burden to prove the entitlement to sovereign immunity. Therefore, on reviewing the question of sovereign immunity here, the Court must only consider the QCA Counterclaims, along with the exhibits, and the Thunderbird Complaint, under Rule 12 in the light most favorable to the Trustee.[22]

---

[20] *Id.* (citations and quotation marks omitted). The District Court also stated:

> I am mindful that the Third Circuit has "cautioned against treating a Rule 12(b)(1) motion as a Rule 12(b)(6) motion and reaching the merits of the claims" because "the standard for surviving a Rule 12(b)(1) motion is lower than that for a 12(b)(6) motion." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir.2000) (citation omitted). In considering whether Defendants' are protected from suit by the Eleventh Amendment, I will avoid evaluation of the merits of Plaintiffs' claims.

*Id.*

[21] *Coles v. New Jersey Dep't of Human Servs.*, No. CIV.A. 13-3987 FLW, 2014 WL 2208142, at *3 (D.N.J. May 28, 2014). *See also Orden v. Borough of Woodstown*, No. CV 13-5002 (JBS/AMD), 2015 WL 8513255, at *4 (D.N.J. Dec. 11, 2015) (citations omitted) ("A facial challenge contests the sufficiency of the complaint because of an alleged pleading deficiency, while a factual attack challenges the actual failure of the plaintiff's claims to comport with jurisdictional prerequisites.").

[22] *Love v. New Jersey State Police*, No. CV141313FLWTJB, 2016 WL 3046257, at *6 (D.N.J. May 26, 2016).

However, both QCA and Thunderbird provided documents establishing their connection to their respective Indian tribes (which is their burden to prove). These documents were not rebutted by the Trustee. The documents, discussed in detail below, provide support for their respective claims of sovereign immunity. As both QCA and Thunderbird are attacking the Court's subject matter jurisdiction, for the reasons set forth below, it is appropriate for the Court to review these documents under Rule 12 in making the determination whether the Court has jurisdiction to hear these matters.

## ANALYSIS

A.   **Tribal Sovereign Immunity**

   i.   *Parties' Arguments*

Both QCA and Thunderbird assert that an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity. Furthermore, QCA and Thunderbird assert that abrogation by Congress of sovereign immunity cannot be implied but must be unequivocally expressed in explicit legislation. They continue that sovereign immunity possessed by Indian tribes also extends to all tribal agencies and subdivisions of a tribe engaged in economic activities, such as running of casinos.

The Trustee responds that QCA and Thunderbird are asserting facts beyond the pleadings and they will have to prove sovereign immunity as an affirmative defense (rather than a matter of subject matter jurisdiction). The Trustee further argues that Congress has abrogated any applicable tribal sovereign immunity by enacting section 106 of the Bankruptcy Code.

QCA and Thunderbird reply that the Court may determine its power to hear a case and to do so it may look to evidence extraneous to the complaint to determine if jurisdiction is proper.  QCA and Thunderbird continue that sovereign immunity is properly extended to QCA and Thunderbird in these matters.

### ii. Considering Facts Outside of the Pleading to Rule Upon Jurisdictional Issues.

#### a. Discussion

In considering whether QCA and Thunderbird are entitled to sovereign immunity, the Court must consider whether the QCA has a sufficient relationship with Quapaw Tribe of Oklahoma and whether Thunderbird has a sufficient relationship to the Absentee Shawnee Tribe of Oklahoma for sovereign immunity to also attach to the casinos.  In addition, the Court must decide whether it has enough evidence at this time to make this determination.

"Tribal sovereign immunity may extend to subdivisions of a tribe, including those engaged in economic activities, provided that the relationship between the tribe and the entity is sufficiently close to properly permit the entity to share in the tribe's immunity."[23] In *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino and Resort*,[24] the Tenth Circuit Court of Appeals held that the Court should look to a variety of factors when examining the relationship between the economic entities, in this case the casinos, and the tribe.  The factors including, but are not limited to:

---

[23] *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010) (footnote and citation omitted).

[24] *Id.*

> (1) their method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities.[25]

The Tenth Circuit explained that the policies underlying tribal sovereign immunity and its connection to tribal economic developed include "protection of the tribe's monies, as well as preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between Indians and non-Indians."[26]

In the cases *sub judice*, the Trustee asserts that the *Breakthrough* 6-factor test is factual, therefore, the Court "must" deny the Motions to Dismiss so that the parties may proceed with discovery. In response, the QCA and Thunderbird assert that the Court may consider the documents that the QCA and Thunderbird attached to their respective pleadings and should make determinations based on those attachments.

The relationship between a casino and a tribe was discussed by the Ninth Circuit Court of Appeals in *Allen v. Gold Country Casino*:

> [The Indian Gaming Regulatory Act[27] (the "IGRA")] provides for the creation and operation of Indian casinos to promote tribal economic development, self-sufficiency, and strong tribal governments. One of the principal purposes of the IGRA is to insure that the Indian tribe is the primary beneficiary of the gaming operation. The compact that created the Gold Country Casino provides that the Casino

---

[25] *Id.* at 1181.

[26] *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1188 (10th Cir. 2010) (citations and internal quotation marks omitted).

[27] 25 U.S.C. §2701, *et seq.*

> will enable the Tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenues to support the Tribe's government and governmental services and programs.  With the Tribe owning and operating the Casino, there is no question that these economic and other advantages inure to the benefit of the Tribe.  Immunity of the Casino directly protects the sovereign Tribe's treasury, which is one of the historic purposes of sovereign immunity in general.  In light of the purposes for which the Tribe founded this Casino and the Tribe's ownership and control of its operations, there can be little doubt that the Casino functions as an arm of the Tribe.  It accordingly enjoys the Tribe's immunity from suit.[28]

In *Allen*, a former tribal casino employee sued the casino for various employment violations.  The Ninth Circuit held that whether tribal immunity extends to a tribal business entity depends not on "whether the activity may be characterized as a business, which is irrelevant under *Kiowa*, but whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe."[29]  The Ninth Circuit noted that the tribe authorized the casino through a tribal ordinance and interstate gaming contract, that the economic advantages created by the casino "inure[d] to the benefit of the Tribe," and that "[i]mmunity of the casino directly protect[ed] the sovereign Tribe's treasury."[30]  The Ninth Circuit concluded that the casino functioned as "an arm of the Tribe" and accordingly enjoyed tribal immunity.[31]

---

[28] *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046–47 (9th Cir. 2006) (citations and internal quotation marks omitted).

[29] *Id.* at 1046.

[30] *Id.* at 1046–47.

[31] *Id.* at 1047.

Both the QCA and Thunderbird attached documentation showing that the casinos were indeed owned and operating by the respective tribes for the economic benefit of the tribes.

### b.  QCA

QCA attaches to its pleadings the Quapaw Tribe of Oklahoma's Resolution No. 082709-C (the "QCA Resolution"), which chartered a new governmental subdivision of the tribe to operate the QCA casino to "operate, manage, maintain and promote the Gaming Business . . . " and to "carry out the purpose and intent of the IGRA . . . ."[32] Furthermore, the resolution continues that the purpose of the QCA is to "provide the maximum possible economic benefit" to the Quapaw Tribe of Oklahoma.[33]   The QCA Resolution also states that the QCA "shall at all times exercise its powers in the best interest of the Tribe."[34]  The QCA Resolution also continues that the "QCA shall not have the power to waive the Tribe's sovereign immunity from suit. . . . [and the] QCA shall be entitled to all of the privileges and immunities of the Tribe, including without limitation, sovereign immunity from suit."[35]  The Resolution also states that the QCA shall make monetary distribution to the tribe monthly.[36]

---

[32] *Reply Brief of the Quapaw Casino Authority in Support of Its Motion to Dismiss Trustee's Counterclaim*, Adv. 14-50437, D.I. 69, Exh. A (Quapaw Tribe of Oklahoma Resolution No. 082709-C, dated Aug 27, 2009, at §4(a)(1-2)).

[33] *Id.* at § 4(A)(4).

[34] *Id.* at § 5(C).

[35] *Id.* at § 7(E) and 8(B).

[36] *Id.* at § 13(C).

As a result of the provisions of the Resolution, the Court finds the QCA has a sufficient relationship with the Quapaw Tribe of Oklahoma to enjoy the Tribe's sovereign immunity. Although the Trustee asserts that this is a factual issue, the Court finds that the Resolution can be used to challenge the Court's subject matter jurisdiction. Nothing was asserted by the Trustee in it counterclaim to rebut these documents as asserted by QCA. Furthermore, the Trustee avers in the QCA Counterclaims that "QCA is a governmental subdivision of the Quapaw Tribe of Oklahoma, which owns and operates the Quapaw Casino . . . ."[37] Thus, the Court finds that QCA enjoys the sovereign immunity of the Quapaw Tribe of Oklahoma.

### c. Thunderbird

Similarly, Thunderbird attached Executive Resolution No. E-AS-2010-106 which states that Thunderbird Entertainment Center, Inc. is wholly owned by the Absentee Shawnee Tribe of Oklahoma and recognizing Thunderbird as a tribal corporation and tribal entity.[38] Furthermore, Thunderbird attached its By-laws, which state that "[a]ll shares in the Corporations shall be owned by the Absentee Shawnee Tribe for the benefit of the Tribe and its recognized members. No individual or legal entity other than the Absentee Shawnee Tribe shall acquire any shares in the Corporation or by paid any dividends."[39] The Thunderbird By-Laws continue that "[a]ll Rights of the shareholder of

---

[37] Adv. Pro. No. 14-50437, D.I. 64 (*Chapter 11 Trustee's Answer and Counterclaim*), at Counterclaim ¶ 8.

[38] Thunderbird Motion to Dismiss, Adv. 16-50410, D.I. 5, Exh. A (Executive Resolution No. E-AS-2010-106 Absentee Shawnee Tribe of Oklahoma, Special executive Committee Meeting, dated Dec. 28, 2010).

[39] Defendant's Reply Memorandum in Support of Motion to Dismiss, Adv. 16-50410, D.I. 7, Exh. B (By-Laws of Thunderbird Entertainment Center, Inc., Art. IV(B) (hereinafter, the "Thunderbird By-Laws")).

the Corporation shall be exercised by the Tribe's Executive Committee acting as the Shareholders' Representative, in accordance with the Tribe's Code of Laws."[40] Furthermore, the Thunderbird By-Laws state that the Thunderbird Entertainment Center "shall have the same tax status and *immunities* under federal law as the Absentee Shawnee Tribe."[41]

As such, based on the documents provided by Thunderbird, the Court finds that Thunderbird has a sufficient relationship with the Absentee Shawnee Tribe of Oklahoma to enjoy the tribe's sovereign immunity. Again, although this may be a factual inquiry,

---

[40] *Id.* at Art. IV(D).

[41] Thunderbird By-Laws, Art. III (B) (emphasis added). The Thunderbird By-Laws also state that the Thunderbird Board of Directors may grant

> limited waiver of its immunity from suit and consent to be sued in the court of the Absentee Shawnee Tribe or another court of competent jurisdiction, provided, however, that: . . .
>
> c. any limited waiver of sovereign immunity may be granted only upon a resolution adopted by the Board of Directors of Thunderbird Entertainment Center, Inc., for the specific purpose of granting a waiver, and upon approval of the Shareholders' Representatives at duly called meeting of the Shareholders' Representatives. Further, the language of the limited waiver must be explicit: and pertain to only Thunderbird Entertainment assets, and no real o monetary assets of the Absentee Shawnee Tribe. Finally, the waiver must be contained in a written contract or commercial document to which Thunderbird Entertainment Center, Inc., is a party;
>
> d. a limited waiver of sovereign immunity may be granted only when necessary to secure a substantial advantage or benefit to Thunderbird Entertainment Center, Inc., or a tribal entity; and
>
> e. a limited waiver of sovereign immunity must be specific and limited as to duration, guarantee, transaction, property or funders of the tribal entity subject to the waiver, court having jurisdiction and applicable law.

*Id.* at Art. X(D)(c-e).

such inquiry may be completed by reviewing the documents attached to Thunderbird's pleadings that attack this Court's subject matters jurisdiction.[42]

### d. Conclusion

As set forth above, the Court considers the corporate documents attached to the pleadings and finds that both QCA and Thunderbird enjoy the sovereign immunity of their respective tribes. Thus, the next inquiry is whether such sovereign immunity has been abrogated by Congress in the Bankruptcy Code or has been waived by either of the movants.

### iii. *Congress Has Not Abrogated Sovereign Immunity Through the Bankruptcy Code.*

The Trustee asserts that the tribes' sovereign immunity, if any, has been abrogated by Congress in Section 106 of the Bankruptcy Code. The Trustee asserts that *even if* QCA and Thunderbird are arms of their respective tribes and enjoy sovereign immunity (which the Court finds that they do), the Trustee's claims are not barred. QCA and Thunderbird respond that Section 106 does not abrogate their sovereign immunity because Congress has not clearly and unequivocally expressed an intent to abrogate the sovereign immunity of Indian tribes in the Bankruptcy Code.

Indian tribes have long been recognized as possessing common law immunity from suit traditionally enjoyed by sovereign powers.

---

[42] The Thunderbird Complaint does **not** make any averments that Thunderbird is related to the Absentee Shawnee Tribe of Oklahoma, rather it limits its averments to Thunderbird's principal place of business address. *See* Adv. Pro. No. 16-50410, D.I. 1 (*Complaint to Avoid Transfers Pursuant to 11 U.S.C. §§ 547, 548, and 502 and to Recover Property Transferred Pursuant to 11 U.S.C. § 550*), at ¶ 9.

> Unlike the immunity of states, which derives from the Eleventh Amendment, the immunity of tribes is a matter of common law, which has been recognized as integral to the sovereignty and self-governance of tribes. Indian tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities, and whether they were made on or off a reservation or settlement. This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But without congressional authorization, the Indian Nations are exempt from suit. Abrogation by Congress of sovereign immunity cannot be implied, but must be "unequivocally expressed" in "explicit legislation."[43]

As a result, the Court must determine if Congress, in the Bankruptcy Code, abrogated the

tribes' sovereign immunity. Section 106(a) states in relevant part:

> (a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to . . .

> (1) [Several enumerated sections of the Bankruptcy Code, including § 542 relating to turnover of estate assets, and § 544 relating to avoidance of liens.]

> (2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.[44]

Section 101(27) defines "governmental unit" as:

> (27) "governmental unit" means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a

---

[43] *Whitaker v. Dakota Finance Corp. (In re Whitaker)*, 474 B.R. 687, 690–91 (B.A.P. 8th Cir. 2012) (citations, internal quotation marks and footnotes omitted).

[44] 11 U.S.C. § 106(a).

> District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.[45]

There is a split of authority regarding whether "governmental unit" includes Indian tribes.  In *Krystal Energy Co. v. Navajo Nation*,[46] the Ninth Circuit held that

> The definition of "governmental unit" first lists a sub-set of all governmental bodies, but then adds a catch-all phrase, "or other foreign or domestic governments." 11 U.S.C. § 101(27). Thus, all foreign and domestic governments, including but not limited to those particularly enumerated in the first part of the definition, are considered "governmental units" for the purpose of the Bankruptcy Code, and, under § 106(a), are subject to suit.

> Indian tribes are certainly governments, whether considered foreign or domestic (and, logically, there is no other form of government outside the foreign/domestic dichotomy, unless one entertains the possibility of extra-terrestrial states).

> The Supreme Court has recognized that Indian tribes are "'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." So the category "Indian tribes" is simply a specific member of the group of domestic governments, the immunity of which Congress intended to abrogate.

> Had Congress simply stated, "sovereign immunity is abrogated as to all parties who otherwise could claim sovereign immunity," there can be no doubt that Indian tribes, as parties who could otherwise claim sovereign immunity, would no longer be able to do so.  Similarly here, Congress explicitly abrogated the immunity of any "foreign or domestic government." Indian tribes are domestic governments. Therefore, Congress expressly abrogated the immunity of Indian tribes.[47]

---

[45] 11 U.S.C. § 101(27).

[46] 357 F.3d 1055, 1057–58 (9th Cir. 2004), *as amended on denial of reh'g* (Apr. 6, 2004).

[47] *Id.* at 1057–58 (citations omitted).

Thus, the Ninth Circuit reasoned that: (i) the Supreme Court has referred to Indian tribes as "domestic dependent nations;" (ii) Congress enacted sections 106 and 101(27) with that reference in mind; (iii) Congress abrogated sovereign immunity as to states, foreign states, and other foreign or domestic governments; and, therefore (iv) Congress must have intended to include Indian tribes as "other foreign or domestic governments."

In *In re Whitaker*, *t*he Eighth Circuit Bankruptcy Appellate Panel (hereinafter, the "*Whitaker* BAP") disagreed with *Krystal Energy*.[48]   In *Whitaker*, trustees in separate Chapter 7 cases brought adversary proceedings to avoid liens or compel turnover against an Indian tribe and the tribal finance company.[49]   The *Whitaker* BAP held that the 4-step process noted above in the *Krystal Energy* ruling is not an "explicit" abrogation of immunity.  Furthermore, the *Whitaker* BAP found that *Krystal Energy* relied on cases that do not support the *Krystal Energy* holding.[50]   The *Whitaker* BAP concluded that the precedent upon which the *Krystal Energy* court relied did not refer to Indian tribes as "governments" or "domestic governments," rather the Indian tribes were referred to as "domestic sovereigns."[51]   The *Whitaker* BAP held that in enacting section 106, "Congress did not unequivocally express its intent by enacting legislation explicitly abrogating the sovereign immunity of tribes. . . . The Tribes are, therefore, protected from suit here by

---

[48] *Whitaker v. Dakota Finance Corp. (In re Whitaker)*, 474 B.R. 687 (B.A.P. 8th Cir. 2012).

[49] *Id.* at 689-90.

[50] *Id.* at 693-95.

[51] *Id.* at 695 (*citing Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 786 111 S. Ct. 2578, 115 L. Ed. 2d 686 (1991) (holding that abrogation of sovereign immunity must be made "unmistakably clear in the language of the statute." (citations omitted)).

their sovereign immunity."[52]  The *Whitaker* BAP ultimately dismissed the actions because Congress did not unequivocally express its intent to abrogate sovereign immunity of Indian tribes in suits under the Bankruptcy Code and the tribal finance company was sufficiently close to the Indian tribe to assert sovereign immunity and could not be subject of avoidance actions brought by the trustees.[53]

Similarly, in *In re Greektown Holdings, LLC*, the District Court for the Eastern District of Michigan stated:

> This Court cannot say with "perfect confidence" that the phrase "other domestic government" unambiguously, clearly, unequivocally and unmistakably refers to Indian tribes. The Bankruptcy Court's conclusion does not give appropriate deference to the Supreme Court's recent admonition that "[t]he special brand of sovereignty the tribes retain—both the nature and its extent—rests in the hands of Congress."  While Congress may not have to utter "magic words," Supreme Court precedent clearly dictates that it utter words that beyond equivocation or the slightest shred of doubt mean "Indian tribes." Congress did not do so in sections 106(a) and 101(27) of the Bankruptcy Code and thus the Tribe is entitled to sovereign immunity from suit in the underlying MUFTA proceeding.[54]

The *Greektown* court stated that it could not presume Congress intended to include Indian tribes in the abrogation set forth in section 106(a) "solely by force of deduction."[55]

---

[52] *Id.* (citations and footnotes omitted).

[53] *Id.* at 697.

[54] *In re Greektown Holdings, LLC*, 532 B.R. 680, 700–01 (E.D. Mich. 2015) (*quoting Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2037, 188 L. Ed. 2d 1071 (2014)).  *See also Meyers v. Oneida Tribe of Indians of Wisconsin*, 836 F.3d 818, 826 (7th Cir. 2016) ("We need not weigh in on the conflict between these courts on how to interpret the breadth the term 'other domestic governments' under the Bankruptcy Code, because we conclude that Congress simply has not unequivocally abrogated the sovereign immunity of Indian Tribes under the FACTA provision at issue in this case.").

[55] *Id.* at 698.

Although the Supreme Court has noted that Congress need not state its intent in a particular way (i.e. use "magic words") the abrogation of immunity needs to be clearly discernible from the statutory text; however, the *Greektown* court noted that there is not a single example in which the Supreme Court has found that Congress intended to abrogate a tribe's sovereign immunity without specifically using the words "Indians" or "Indian tribes."[56]

This Court concludes that Congress has not unequivocally abrogated the sovereign immunity of Indian tribes under sections 106(a) and 101(27) of the Bankruptcy Code. The Court is persuaded by the reasoning in *Whitaker* and *Greektown*. Both decisions discuss the case history, are well reasoned, and carefully construe the text of the Bankruptcy Code. The Court finds that, as neither the terms "Indians" nor "Indian tribes" were included in the language of section 101(27) of the Bankruptcy Code, Congress did not unequivocally express an intent to abrogate the sovereign immunity of Indian tribes in section 106(a) of the Bankruptcy Code.

### iv.    Conclusion

As a result, the Court finds that not only do QCA and Thunderbird enjoy their respective tribes' sovereign immunity but such sovereign immunity has not been abrogated by the Bankruptcy Code. Thus, the Trustee's claims are barred against Thunderbird. The Trustee's claims against QCA are also barred unless such sovereign immunity has been waived.

---

[56] *Id.* at 699.

### B.  Waiver of Sovereign Immunity (QCA Only)

#### i.  *Parties' Arguments*

The Trustee argues that QCA waived any sovereign immunity it may have had concerning the Trustee's counterclaim when it filed a proof of claim against Check Holdings.  QCA asserts that it did not waive its immunity as the Trustee's counterclaim for avoidance of a preference is wholly separate and distinct from QCA's affirmative claims for recovery of funds from Check Holdings under its theory that the funds held by Check Holdings are the legal and/or equitable property of QCA.  QCA asserts that the only recognized exception to sovereign immunity is that a tribe, by filing a lawsuit, waives sovereign immunity for the equitable defenses sounding in recoupment.  QCA asserts that this exception is narrow and does not apply to claims of a different form or nature nor exceeding in amount that sought by the sovereign as plaintiff.  QCA continues that the series of transactions subject to its claims against Check Holdings are not even in the same timeframe and thus, are not recoupment claims.

The Trustee responds that (i) both QCA's claims and the QCA Counterclaims all arise under the Finance Services Agreement and are based on the same series of occurrences;  (ii) the claim and counterclaims both involve the same issue: whether the Financial Services Agreement established a debtor-creditor relationship between Check Holdings and QCA and the nature of Check Holdings' obligations under the contract; (iii) the Trustee seeks to avoid preferential transfers to QCA under the Financial Services Agreement and courts have held that preference claims by a bankruptcy estate arise out

of the same transaction or occurrence as claims filed by a governmental entity against the estate; (iv) Section 502(d) of the Bankruptcy Code bars any recovery on QCA's claim until any preferential transfers have been repaid to the estate; and (v) QCA waived it sovereign immunity by filing a proof of claim, and such waiver, although limited, is broader than that sounding in recoupment.

QCA replied that its waiver of sovereign immunity are limited to those sounding in recoupment, which is narrowly construed in the bankruptcy context.

### ii. *Discussion*

As discussed above, the Court finds that QCA enjoys the tribe's sovereign immunity and Section 106(a) and 101(27) do not abrogate QCA's immunity. As a result, the next question becomes whether by filing a proof of claim or the Intervener Complaint, did QCA waive its sovereign immunity? In *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma*,[57] an Indian tribe sought an injunction against a proposed tax assessment and the taxing commission answered and asserted a compulsory counterclaim.[58] The Supreme Court held that the tribe possessed immunity from direct suit; thus, the Indian tribe possessed a similar immunity from cross-suits.[59] The taxing commission did not argue that it received congressional authorization to adjudicate a counterclaim against the Tribe; thus, the Supreme Court concluded that "the

---

[57] 498 U.S. 505, 111 S. Ct. 905, 909, 112 L. Ed. 2d 1112 (1991).

[58] *Id.* at 509.

[59] *Id.*

Tribe did not waive its sovereign immunity merely by filing an action for injunctive relief."[60]

In *Berrey v. Asarco, Inc.*,[61] the plaintiff Indian tribe alleged the defendants caused environmental contamination on Indian lands as a result of the defendants' mining activities.[62]  The defendants asserted counterclaims for contribution and indemnity, which the plaintiff Indian tribe asserted were barred by sovereign immunity.[63]  The Tenth Circuit held that tribal sovereign immunity is deemed to be coextensive with the immunity of the United States.[64]  The Tenth Circuit analogized that the Supreme Court has recognized that when the United States brings suit, it impliedly waives its immunity as to all claims asserted by the defendant in recoupment.[65]  The Tenth Circuit continued:

> Claims in recoupment arise out of the same transaction or occurrence, seek the same kind of relief as the plaintiff, and do not seek an amount in excess of that sought by the plaintiff. The waiver of sovereign immunity is predicated on the rationale that recoupment is in the nature of a defense arising out of some feature of the transaction upon which the sovereign's action is grounded. . . . [W]e extended application of the recoupment doctrine to Indian tribes; thus, when a tribe files suit it waives its immunity as to counterclaims of the defendant that sound in recoupment.[66]

---

[60] *Id.* at 509-10.

[61]  439 F.3d 636 (10th Cir. 2006).

[62]  *Id.* at 640.

[63]  *Id.*

[64]  *Id.* at 643.

[65]  *Id.* (*citing Bull v. United States*, 295 U.S. 247, 260–63, 55 S.Ct. 695, 79 L.Ed. 1421 (1935)).

[66]  *Id.* (citations and internal quotation marks omitted).

The Tenth Circuit continued: "Waiver under the doctrine of recoupment, however, does not require prior waiver by the sovereign or an independent congressional abrogation of immunity. If the defendant's counterclaims are already permitted under an independent congressional abrogation of immunity, there would be no need for implied waiver under the recoupment doctrine."[67]  Thus, regardless of whether Congress explicitly waived tribal sovereign immunity, a claim for recoupment is not barred.

In *Jicarilla Apache Tribe v. Andrus*,[68] the Tenth Circuit held:

> "when the sovereign sues it waives immunity as to claims of the defendant which assert matters in recoupment-arising out of the same transaction or occurrence which is the subject matter of the government's suit, and to the extent of defeating the government's claim but not to the extent of a judgment against the government which is affirmative in the sense of involving relief different in kind or nature to that sought by the government or in the sense of exceeding the amount of the government's claims; but the sovereign does not waive immunity as to claims which do not meet the 'same transaction or occurrence test' nor to claims of a different form or nature than that sought by it as plaintiff nor to claims exceeding in amount that sought by it as plaintiff."[69]

Furthermore, the Third Circuit has held that recoupment is to be narrowly construed:

> a mere logical relationship is not enough: the fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, . . . does not mean that the two arose from the "same transaction." Rather, both debts must arise out of a **single integrated transaction** so that it would be

---

[67] *Id.* at 644.

[68] 687 F.2d 1324 (10th Cir. 1982).

[69] *Id.* at 1344 (*quoting Frederick v. United States*, 386 F.2d 481, 488 (5th Cir. 1967)) (other citations omitted).

> inequitable for the debtor to enjoy the benefits of that
> transaction without also meeting its obligations.[70]

The Third Circuit distinguishes the right from set-off from the right of recoupment, although both permit a creditor that owes a debt to the debtor to reduce the amount of its debt by the amount of a debt owed by the debtor to the creditor, as the right to recoupment must arise out of the same transaction.[71]  For example, in *In re Anes*, the debtor's debt arose from a loan she obtained from her government-employer's retirement system whereas the governmental unit's obligation to pay the debtor's salary arose from the debtor's contract of employment and performance of her job.[72]  The Third Circuit opined that there may be a right to set-off but not a right to recoupment because the obligation to repay the loan did not arise from same transaction as their employers' obligations to pay their salaries.[73]  Thus, "[f]or the purposes of recoupment, a mere logical relationship is not enough: the 'fact that the same two parties are involved, and that a similar subject matter gave rise to both claims, ... does not mean that the two arose from the "same transaction."'  Rather, both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations.  Use of this stricter standard for delineating the bounds of a transaction in the context of recoupment is in accord with the

---

[70] *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1081 (3d Cir. 1992) (emphasis added, citations and internal quotation marked omitted).

[71] *In re Anes*, 195 F.3d 177, 182 (3d Cir. 1999).

[72] *Id.* at 183.

[73] *Id.*

principle that this doctrine, as a non-statutory, equitable exception to the automatic stay, should be narrowly construed."[74]

### a. The Court Does Not Have Enough Information To Assess The Transactions Under The Financial Services Agreement.

QCA and the Debtors were parties to the Financial Services Agreement and the claims asserted against the Check Holdings' estate by QCA as well as the avoidance of the preferential transfers sought by the Trustee arise out of the Financial Services Agreement.

The Third Circuit has held that:

> In the bankruptcy context, recoupment has often been applied where the relevant claims arise out of a **single contract** "that provide[s] for advance payments based on estimates of what ultimately would be owed, subject to later correction." However, an express contractual right is not necessary to effect a recoupment. Nor does the fact that a contract exists between the debtor and creditor automatically enable the creditor to effect a recoupment.[75]

In *University Medical Center*, the court concluded that the Department of Health and Human Services ("HHS") was not entitled to equitable recoupment for overpayments in 1985 through 1987 against amounts due to the bankrupt medical center in 1988 under a Medicare provider agreement. The court recognized that the Medicare program operated on a net balance accounting system where HHS paid the medical center based on estimates of future expenditures and then, following an annual audit to determine actual

---

[74] *Id.* at 182.

[75] *Univ. Med. Ctr. V. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1080 (3d Cir. 1992).

costs, adjusted subsequent payments to account for prior over or underpayments.[76]  The Third Circuit further stated that while recoupment has been applied where relevant claims arise from a single contract, the fact that a contract exists between the debtor and creditor does not automatically enable the creditor to effect a recoupment.[77]  The Third Circuit concluded that the provider agreement, which it characterized as a "unique type of contract" that did not "provide for a defined transaction or even a series of transactions" and had not been assumed by the medical center post-bankruptcy, merely established a "relationship between the parties."[78]  This relationship was "not sufficient to support the conclusion that Medicare overpayments made to UMC in 1985 arise from the same transaction, for the purposes of equitable recoupment, as Medicare payments due UMC for services provided in 1988."[79]  "Recovery of the 1985 overpayment therefore, is the final act of the transaction that began in 1985.  UMC's 1988 post-petition services were the beginning of transactions that would stretch into the future, but they were not part of the 1985 transactions."[80]

Similarly, as stated by the Tenth Circuit:

> A "same contract equals same transaction" rule would be overly simplistic.  Instead, as our case law illustrates, the

---

[76] *Id.* at 1070.

[77] *Id.* at 1080.

[78] *Id.* at 1081.

[79] *Id.*

[80] *Id.* at 1082.  *See also Reliance Ins. Co. (In Liquidation) v. Apple Computer, Inc.*, No. 1 REL 2001, 2011 WL 10894815, at *7 (Pa. Commw. Ct. June 23, 2011) (not precedential) ("[T]he parties in the present case formed a contractual relationship under the Policy but this relationship is not alone enough to make their every interaction related to the Policy an integrated transaction for purpose of recoupment.").

> "same transaction" analysis involves an examination of the parties' equities. We held . . . that recoupment permits a creditor to offset a claim that arises from the same transaction as the debtor's claim because application of the limitations on setoff in bankruptcy would be inequitable. . . . [W]e analogized recoupment to unjust enrichment: The situation before us is not one in which the creditor seeking relief consciously extended credit as did the bankrupt's ordinary creditors, but rather allowing [the debtor's] . . . other creditors to share in this money in controversy would give them a windfall, a classic case of unjust enrichment.  In light of recoupment's equitable foundation, the doctrine is only applicable to claims that are so closely intertwined that allowing the debtor to escape its obligation would be inequitable notwithstanding the Bankruptcy Code's tenet that all unsecured creditors share equally in the debtor's estate.[81]

"The common thread in the decisions ruling recoupment rights are present is that the rights are derived from a single agreement.  The contract often called for numerous, separate deliveries, services or payments over a period of time.  In finding a single transaction, the courts looked to the agreement of the parties and found the conduct at issue within the scope of the agreement."[82]

In the case *sub judice*, the Court simply does not have enough information to evaluate QCA's claims against Check Holdings in comparison to those claims brought by the Trustee against QCA to determine if the transfers are part of the same transaction or each individual transactions.   QCA's claims against Check Holdings concern reimbursements that were *not* made between April 16, 2014, and May 14, 2014; whereas, the Trustee's counterclaims against QCA seek reimbursements of payments *made* to QCA

---

[81] *In re Peterson Distrib., Inc.*, 82 F.3d 956, 960 (10th Cir. 1996) (collecting cases) (citations, quotation marks and modifications omitted).

[82] *First Union Nat'l Bank of Fl. v. Abbey Fin Corp. (In re Abbey Fin. Corp.)*, 193 B.R. 89, 96 (Bankr. D. Mass. 1996).

between February 24, 2014, and April 23, 2014.  Obviously, there is some overlap of time.

Furthermore, the nature of the contract between the Trustee and QCA may be one

singular, yet ongoing, transaction; however, the Court does not have enough information

to make this determination.  At the very least, the Court would need to review the terms

of the Financial Services Agreement to determine whether the terms of the contract

dictate individual transactions or one cohesive transaction.  However, the Court finds

that, under no circumstances, could the amount sought by the Trustee under recoupment

exceed the amount sought by QCA – **at most**, QCA's claim ($502,018) could be brought

to $0 by the Trustee's claim of recoupment ($1,114,020.76), if any.[83]

Thus, the Court will deny the motion to dismiss the QCA Counterclaims solely for

the purpose of determining whether the Trustee's counterclaims and QCA claims may be

subject to recoupment.  However, the Court determines that the Trustee may not avoid

an amount in excess of QCA's claims against Money Centers.  Thus, although the Court

is not making a ruling on whether QCA's claims are subject to recoupment, there is a

substantially narrowing of the gap between the parties.

### b.  Section 502(d) Does Not Apply to a Sovereign Tribe.

The Trustee asserts that, pursuant to Section 502(d), QCA is barred from

recovering on its claim until the preferential transfers have been repaid to the estate.  As

mentioned above, the QCA Counterclaims are barred by sovereign immunity except in

---

[83] *See Jicarilla Apache Tribe*, 687 F.2d at 1344.

the limited exception of recoupment.  Thus, the Court finds that Section 502(d) is not

operative as to the QCA.

### c.   QCA Did Not Waive Its Sovereign Immunity By Filing a Claim.

QCA filed a proof of claim against Check Holdings in the amount of $502,018.[84]

The Trustee asserts that by filing a proof of claim, QCA waived it sovereign immunity, at

least as to the matters set forth in QCA's claim.

Section 106(b) of the Bankruptcy Code, which provides:

> A **governmental unit** that has filed a proof of claim in the case
> is deemed to have waived sovereign immunity with respect
> to a claim against such governmental unit that is property of
> the estate and that arose out of the same transaction or
> occurrence out of which the claim of such governmental unit
> arose.[85]

Contrary to what was asserted by the Trustee, the Bankruptcy Code refers to a

"governmental unit" that files a proof of claim, not a "sovereign."  Thus, again, we must

refer back to Section 101(27) which, as held above, does not include Indian tribes in its

definition.  Thus, Section 106(b) is not operative in the QCA Adversary Action.

### iii.    Conclusion

As discussed above, the waiver of sovereign immunity is limited to claims

sounding in recoupment.  The Court does not have sufficient information to determine

whether the transaction contemplated in QCA's complaint against the Debtors result

from the same transaction as the Trustee's preference claims against QCA.  However,

---

[84] *See*, *supra*, n. 5.

[85] 11 U.S.C. §106(b) (emphasis added).

even if the Trustee's counterclaims sound in recoupment, the Trustee's claim would be limited to the amount asserted by QCA. In other words, the Trustee would be unable to collect affirmative relief (i.e. cash) from QCA. Other than this limited circumstance of recoupment, QCA has not waived its sovereign immunity by filing its adversary action against the Debtors nor by filing a proof of claim.

## CONCLUSION

As set forth above, the Court finds that: (i) this is a facial attack on the Court's subject matter jurisdiction allowing the Court to review various documents attached to the pleadings; (ii) both QCA and Thunderbird are sufficiently related to their respective Indian tribes to enjoy the tribes' sovereign immunity; and (iii) neither Section 106(a) nor Section 101(27) abrogates QCA's and Thunderbird's sovereign immunity. Thus, Thunderbird's motion to dismiss will be granted.

Furthermore, as to QCA only, the Court finds that it does not have sufficient information to determine whether there was a limited waiver of QCA's sovereign immunity, to the extent of recoupment *only*, as to QCA's claims. Although, at most recoupment would be limited to the amount of QCA's claims against the Money Center's estate.

Thus, the Court will grant, in part, and deny, in part, QCA's motion to dismiss by finding that, indeed, QCA enjoys sovereign immunity but finding that this sovereign immunity *may* have been waived to the extent of recoupment, but *only* to the extent of

QCA's claims against the estates (i.e. the Trustee will not be able to recover any amounts in excess of QCA's claims from QCA).

Respective orders will be entered.